**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(BOSTON DIVISION)**

| | | |
|---|---|---|
| MARK ANTHONY REID, | ) | |
| | ) | |
| on behalf of himself and others | ) | |
| similarly situated, | ) | |
| | ) | |
| Petitioner/Plaintiff, | ) | |
| | ) | Civil No. 3:13-cv-30125-PBS |
| v. | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| CHRISTOPHER DONELAN, SHERIFF, | ) | |
| FRANKLIN COUNTY, MASS., ET AL., | ) | |
| | ) | Date: April 15, 2019 |
| Respondents/Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ i

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

PROCEDURAL HISTORY ........................................................................................... 2

ARGUMENT ................................................................................................................ 4

    I.   8 U.S.C. § 1226(c) unambiguously requires detention — without bond — of certain
        criminal and terrorist aliens until the conclusion of their removal proceedings................. 4

      A.   Section 1226(c)'s plain language and structure mandates no-bond detention. ............... 4

      B.   Congress determined, based on extensive investigation, that criminal aliens' flight risk
         and danger to the community are serious problems that justify mandatory detention .... 7

             Aliens subject to § 1226(c) mandatory detention. .................................................. 10

      C.   Section 1226(c) mandatory detention of criminal aliens for their entire removal
         proceedings comports with due process, and nothing supports Plaintiffs' request for
         automatic bond hearings................................................................................................. 13

             1. *Demore* precludes a finding that § 1226(c) detention automatically violates due
             process when it exceeds six months............................................................................. 14

             2. The justifications for detaining a criminal alien during his removal proceedings do
             not evaporate at any fixed point in detention, much less the six-month mark............ 19

             3. The liberty interests of criminal aliens detained under section 1226(c) are ordinarily
             substantially diminished and suitably addressed by *Joseph* hearings. ......................... 22

   II.  In the unusual case where detention is no longer serving its immigration purpose prior to
       the end of removal proceedings, the proper mechanism for relief is an individual petition
       for writ of habeas corpus................................................................................................. 23

  III. Because the Eighth Amendment does not apply to immigration cases, § 1226(c) detention
       does not violate the Excessive Bail Clause...................................................................... 29

  IV. To the extent that the Court finds that any type of hearings are warranted, the government
       is not required to bear the burden of proof — and certainly not by clear-and-convincing
       evidence — and Plaintiffs are collaterally estopped from arguing otherwise. .................. 30

   V.  Defendants are entitled to Summary Judgment because the Court cannot grant classwide
       declaratory relief that is functionally equivalent to the classwide injunctive relief
       precluded by 8 U.S.C. § 1252(f)(1). ............................................................................... 36

CONCLUSION............................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) ................................................................ 35

*Alli v. Decker*, 650 F.3d 1007 (3d Cir. 2011) ........................................................... 37

*Avramenkov v. I.N.S.*, 99 F. Supp. 2d 210 (D. Conn. 2000) ...................................... 30

*Barbot v. Warden Hudson County Correctional Facility*, 906 F.3d 274 (3d Cir. 2018) ............. 34

*Barker v. Wingo*, 407 U.S. 514 (1972) ..................................................................... 26

*California v. Grace Brethren Church*, 457 U.S. 393 (1982) ........................................ 37

*Carlson v. Landon,* 342 U.S. 524 (1952) ............................................................ *passim*

*Chaffin v. Stynchcombe*, 412 U.S. 17 (1973) ........................................................... 20

*Clark v. Martinez*, 543 U.S. 371 (2005) .................................................................. 16

*Demore v. Kim*, 538 U.S. 510 (2003) .................................................................. *passim*

*Doherty v. Thornburgh*, 943 F.2d 204 (2d Cir. 1991) ............................................... 21

*Edwards v. Johnson*, 209 F.3d 772 (5th Cir. 2000) .................................................. 30

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ................................................................ 35

*Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018) .................................................. 37

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ......................................................... 30

*Jennings v. Rodriguez*, – U.S. –, 138 S.Ct. 830 (2018) ........................................ *passim*

*Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46 (1st Cir. 1997) ................ 31

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953) .................................................... 16

*Landon v. Plasencia*, 459 U.S. 21 (1982) ................................................................ 25

*Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001) .......................................... 25

*Mathews v. Diaz*, 426 U.S. 67 (1976) ...................................................................... 35

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................. 25

*Matter of Adeniji*, 22 I. & N. Dec. 1102 (BIA 1999) ................................................ 33

*Matter of C-*, 20 I. & N. Dec. 529 (BIA 1992) ............................................................ 28

*Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006) ....................................................... 33

*Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999) ..................................................... 22

*McGautha v. California*, 402 U.S. 183 (1971) ............................................................ 20

*Morales-Izquierdo v. Gonzales*, 486 F.3d 484 (9th Cir. 1984) .................................... 17

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................. 25

*Nielsen v. Preap*, No. 16-1363, 2019 WL 1245517 (U.S. Mar. 19, 2019) ........................ *passim*

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................... 23

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .................................................................. 22

*Pensamiento v. McDonald*, 315 F.Supp.3d 684 (D. Mass. 2018) ........................... 34, 35

*Reid v. Donelan*, 819 F.3d 486 (1st Cir. 2016) .................................................... *passim*

*Reid v. Donelan*, No. CV 13-30125-PBS, 2018 WL 5269992 (D. Mass. Oct. 23, 2018) .... 3, 4, 36

*Reid v. Donelan*, 22 F.Supp.3d 84 (D. Mass. 2014) .............................................. 30, 32

*Reno v. Flores,* 507 U.S. 292 (1993) .................................................................. *passim*

*Rodriguez v. Marin*, 909 F.3d 252 (9th Cir. 2018) ................................................ 33, 36

*Samuels v. Mackell*, 401 U.S. 66 (1971) ..................................................................... 37

*Schall v. Martin*, 467 U.S. 253 (1984) ....................................................................... 29

*Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199 (11th Cir. 2016) ..................................... 28

*U.S. v. Morrison*, 529 U.S. 598 (2000) .................................................................. 1, 13

*U.S. v. Salerno*, 481 U.S. 739 (1987) ..................................................................... 29, 30

*Welch v. Ashcroft*, 293 F.3d 213 (4th Cir. 2002) ....................................................... 14

*Wilkinson v. Austin*, 545 U.S. 209 (2005) .................................................................. 26

*Wong Wing v. U.S.*, 163 U.S. 228 (1896) .............................................................. 14, 19

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ............................................................. *passim*

**Statutes**

8 U.S.C. § 1101(a)(43) ............................................................................... 12

8 U.S.C. § 1101(b)(4) ................................................................................. 22

8 U.S.C. § 1158(a) ..................................................................................... 22

8 U.S.C. § 1226(a) ............................................................................... *passim*

8 U.S.C. § 1226(c) ............................................................................... *passim*

8 U.S.C. § 1229a ................................................................... 14, 19, 22, 23

8 U.S.C. § 1229b ....................................................................................... 23

8 U.S.C. § 1231 ............................................................................... 6, 15, 23

8 U.S.C. § 1252(a)(2) ................................................................................... 7

8 U.S.C. § 1252(a)(2) (1988) ....................................................................... 7

8 U.S.C. § 1252(f)(1) ....................................................................... 4, 36, 37

18 U.S.C. § 3142 ....................................................................................... 29

Pub. L. 100-690 ........................................................................................... 7

Pub. L. 101-649 ........................................................................................... 7

Pub. L. 104-208 ......................................................................................... 10

**Rules**

Fed. R. Civ. P. 23(b)(2) .................................................................... 4, 36, 37

**Regulations**

8 C.F.R. § 236.1 ................................................................................. 32, 35

8 C.F.R. § 1003.1(b) .......................................................................... 17, 22

8 C.F.R. § 1003.1(e)(8) ............................................................................. 17

8 C.F.R. § 1003.19(e) ........................................................................ 32, 35

8 C.F.R. § 1003.38(a) ............................................................................... 22

8 C.F.R. § 1208.17 ................................................................................... 11

8 C.F.R. § 1236.1(d)(1) .................................................................................... 32

8 C.F.R. § 1240.11(c)(1) .................................................................................. 22

**Other Authorities**

*Criminal Aliens in the United States: Hearings Before the Permanent Subcomm. on Investigations of the Senate Committee on Governmental Affairs*, 103d Cong. (1993) ............ 8

*Criminal and Illegal Aliens, Subcomm. on Immigration and Claims of the House Comm. on the Judiciary*, 1996 WL 502071 (Sept. 5, 1996) ............................................................. 9

Dep't of Justice, *Administrative Review and Appeals: FY 2018 Budget Request at a Glance* ..... 17

Dep't of Justice FY17 Annual Performance Report and FY2019 Performance Plan  (Feb. 2018) .................................................................................................................. 17

Dep't of Justice, Office of the Inspector General, Immigration and Naturalization Service, Deportation of Aliens After Final Orders Have Been Issued, Rep. No. I–96–03 (Mar. 1996) ... 8

EOIR, Office of the Chief Immigration Judge OPPM 17-01: Continuances ............................. 18

*Hearing on H.R. 723, et al., Before the Subcomm. on International Law, Immigration, and Refugees of the House Comm. on the Judiciary*, 103d Cong. (1994) ...................................... 10

*Hearing on H.R. 3333 Before the Subcomm. on Immigration, Refugees, and International Law, of the House Comm. on the Judiciary*, 101st Cong. (1989) .................................................. 9, 11

H.R. Rep. No. 104-22 (1995) ................................................................................................ 7

H.R. Rep. No. 104-469 (1996) .............................................................................................. 7

ICE, *Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions* (Aug. 20, 2010) ............................................................ 18

Immigration Court Practice Manual Ch. 5 (2018) .................................................................. 18

Memorandum: Case Priorities and Immigration Court Performance Measures from James R. McHenry III, Director to The Office of the Chief Immigration Judge, EOIR ........................ 17

Office of the Principal Legal Advisor, ICE, *Continuances and Briefing Extensions Before EOIR* (Jul. 1, 2014) ................................................................................................................... 18

S. Rep. No. 104-48 (1995) .......................................................................................... *passim*

**INTRODUCTION**

Section 1226(c) of 8 U.S.C. mandates the detention of certain criminal and terrorist aliens during removal proceedings. Congress's dissatisfaction with the prior system — where criminal and terrorist aliens could be released on bond during their removal proceedings — was pellucid. As this case confirms, specific evidence before Congress established that certain criminal and terrorist aliens committed more crimes and endangered the public when released on bond and absconded while their removal proceedings were pending, avoiding their ultimate removal. Thus, Congress prohibited these aliens from release during removal proceedings.

The Supreme Court has confirmed that § 1226(c) mandates detention without a bond hearing for the duration of the removal proceedings. In *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court upheld the constitutionality of detaining a lawful permanent resident alien for more than six months, thus illustrating that the constitutionality of § 1226(c) detention cannot be decided simply by looking at a calendar. Rather, the constitutionality of continued detention depends on whether that detention continues to "serve its purported immigration purpose." *Demore*, 538 U.S. at 527. *Jennings v. Rodriguez*, – U.S. –, 138 S.Ct. 830, 847 (2018). And in *Jennings*, the Supreme Court re-affirmed that § 1226(c) mandates detention without a bond hearing for the duration of the administrative process. Thus, in the wake of *Jennings*, any constitutional analysis of § 1226(c) must acknowledge that the statute unambiguously requires detention for the entirety of the removal proceedings and must presume that such detention is constitutional, *see U.S. v. Morrison*, 529 U.S. 598, 607 (2000). Accordingly, there is no basis for Plaintiffs — who fall squarely under § 1226(c)'s mandatory detention provision — to claim that they are somehow categorically entitled to bond hearings, or in the alternative, "reasonableness hearings," after six months of § 1226(c) detention. *See* ECF No. 421 at 18–19. Therefore, the

Court should grant summary judgment in Defendants' favor.

## STATEMENT OF FACTS

Defendants' Local Rule 56.1 Statement of Material Facts ("SMF") is attached hereto as Exhibit 1.

## PROCEDURAL HISTORY

The parties have previously documented this case's lengthy procedural history.[1]

On May 11, 2018, in light of the Supreme Court's opinion in *Jennings*, the First Circuit withdrew its April 13, 2016, opinion and vacated its judgment. *Reid v. Donelan*, 819 F.3d 486, 495 (1st Cir. 2016), *cert. denied*, 138 S. Ct. 1547 (2018), *vacated on* May 11, 2018. Additionally, the First Circuit affirmed in part the Court's January 9, 2014 judgment as to Reid (under the fact-dependent approach), and vacated the May 27, 2014, judgment to the class members.

On June 26, 2018, Defendants filed a motion to decertify the class, relying on *Jennings* and the First Circuit's withdrawn opinion in *Reid*. ECF Nos. 377–377-1. Plaintiffs opposed decertification, and moved to amend the complaint and modify the class, asking the Court to expand the class action's geographic scope to include New Hampshire and to add two new class representatives. ECF Nos. 378–384-1. Plaintiffs also sought to add an alternative form of relief: so-called "reasonableness hearings" before an IJ after six months' detention to determine whether the detention should be reviewed at a bond hearing. *See* ECF Nos. 378–384-1.[2]

On September 17, 2018, the Court held a hearing on these motions and articulated a desire "to understand what's happening in the field" before moving to "briefing on summary

---

[1] Accordingly, Defendants incorporate by reference the procedural history of this case, as detailed in Defendants' prior filings. *See* ECF Nos. 377, 377-1, 388.
[2] Plaintiffs also moved for summary judgment, ECF Nos. 386–387-11, and the Court denied the motion without prejudice. ECF No. 418.

judgment." Sept. 17, 2018 Hearing Transcript at 60. Per the Court's order, the parties filed a Joint

Status Report on October 17, 2018. ECF Nos. 415–415-5. Plaintiffs stated their desire for limited

discovery. ECF Nos. 415 at 10, 415-4–415-5. Defendants maintained that Plaintiffs were not

entitled to discovery; in response to the Court's statements at the hearing, however, Defendants

provided statistics from the Executive Office of Immigration Review ("EOIR") covering 20

years of immigration case completion times for detained individuals at the Boston and Hartford

Immigration Courts who have removal charges that may trigger § 1226(c) mandatory detention,

as well as information regarding average processing times for those cases appealed to the BIA.

ECF No. 415–415-1. This data revealed, *inter alia*:

- Over the past 5 years, the median completion time in nonappealed cases was below 45
  days in Boston and below 40 days in Hartford.
    - The median completion time for appealed cases was fewer than 100 days in
      Boston and fewer than 80 days in Hartford.
- In FY 2018, for nonappealed cases, only 10.7% of cases in Boston and 15% of cases in
  Hartford took longer than 6 months to resolve.
    - In FY 2018 for appealed cases, 25% in Boston and 0% in Hartford took longer
      than 6 months to resolve.
- Over the past 5 years, for nonappealed cases, Boston IJs granted relief to only 11.3% of
  individuals and terminated 9.2% of cases; Hartford IJs granted relief to 12.2% of
  individuals and terminated 4.7% of cases.
    - In the past 5 years, for appealed cases, Boston IJs granted relief to fewer than 1%
      of individuals and terminated 2.9% of cases; Hartford IJs granted relief to 0% of
      individuals and terminated 0% of cases.

*See* ECF Nos. 415–415-1.

On October 23, 2018, the Court denied Defendants' decertification motion and granted

Plaintiffs' motions to amend the complaint and modify the class. ECF No. 416; *Reid v. Donelan*,

No. CV 13-30125-PBS, 2018 WL 5269992, at *1 (D. Mass. Oct. 23, 2018). The Court found

that, although *Jennings* resolved the prior common question, "the class has another common

question: whether the Constitution (either the Due Process Clause or Excessive Bail Clause)

3

requires an individualized hearing for those detained under § 1226(c) beyond six months." *Id*. at

*4. Because the Court found that this was a pure question of law, it determined that it "need not

consider the factual differences among the class members that may be relevant in determining

whether they are ultimately released." *Id*. at *5. The Court rejected Defendants' arguments that

the individualized determination required by due process mandated decertification, explaining

that, although "[t]he [First Circuit's] withdrawn opinion may doom Plaintiffs' argument on the

merits," the class still presented a common, unanswered question. *Id*. at *6. It also held that 8

U.S.C. § 1252(f)(1) did not require decertification of the class because § 1252(f)(1) does not bar

classwide declaratory relief, which suffices to satisfy Rule 23(b)(2). *Id*.

On October 23, 2018, the Court ordered that "[t]he parties may conduct limited discovery

related to the average and median detention times for aliens subject to 8 U.S.C. § 1226(c)." ECF

No. 420. Thus, Defendants provided Plaintiffs with data for 113 class members that vested since

the Court's May 27, 2014 summary judgment order through November 14, 2018. *See* Exhibit 2.[3]

The parties' cross-motions for summary judgment are now before the Court.

## ARGUMENT

I.      **8 U.S.C. § 1226(C) UNAMBIGUOUSLY REQUIRES DETENTION — WITHOUT BOND — OF CERTAIN CRIMINAL AND TERRORIST ALIENS UNTIL THE CONCLUSION OF THEIR REMOVAL PROCEEDINGS.**

    A.      **Section 1226(c)'s plain language and structure mandates no-bond detention.**

By its plain language and structure, § 1226 mandates detention of certain criminal and

terrorist aliens during their removal proceedings. Section 1226(c) applies to aliens that have

---

[3] Defendants also provided Plaintiffs data regarding all detained aliens with removal charges that may trigger § 1226(c) detention whose removal cases were completed in the Boston and Hartford Immigration Courts for fiscal year 2016 through 2018, as well as and those whose cases were pending as of March 9, 2019.

committed certain dangerous crimes and those who have connections to terrorism," and "forbids" their release, requiring that they "be arrested and detained *without a chance to apply for release on bond* or parole." *Nielsen v. Preap*, No. 16-1363, 2019 WL 1245517, at *3–4 (U.S. Mar. 19, 2019) (emphasis added). Thus, Congress has deemed the procedures outlined in § 1226(a) — where certain aliens may apply for release on bond while litigating their removal — "too risky" for these criminal and terrorist aliens. *Preap*, 2019 WL 1245517, at *3.[4]

In contrast, § 1226(c) *mandates* detention of certain aliens during removal proceedings. *See* 8 U.S.C. § 1226(c) ("The Attorney General *shall* take into custody any alien who" is removable or inadmissible for specified criminal offenses) (emphasis added). Section 1226(c) does not allow the Attorney General to exercise discretion; does not limit the detention time of criminal aliens, terrorists, and national security threats during removal proceedings; does not provide any transformative mechanism by which detention following the expiration of any time limit reverts to detention pursuant to some other provision; and does not provide any contingency for bond hearings. 8 U.S.C. § 1226(c)(1). Furthermore, § 1226(c)'s no-bond-detention rules do not expire. *Id.* By its plain terms, § 1226(c) manifestly precludes bond hearings for certain detained criminal aliens during removal proceedings. *Id.*

Section 1226(c)(2) leaves no doubt that the government cannot release these aliens during the pendency of their removal proceedings except in very limited circumstances: "[t]he Attorney General may release an alien described in paragraph (1) *only* if the Attorney General decides" that release is warranted for certain enumerated witness-protection purposes. 8 U.S.C.

---

[4] Section 1226(a) provides, that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). This provision gives DHS the discretionary authority initially to determine whether an alien will remain in custody during removal proceedings and it permits an alien to request release through a bond hearing before an IJ. *See* 8 U.S.C. § 1226(a)(2)(A).

§ 1226(c)(2) (emphasis added). The clear purpose and effect of these provisions are to mandate detention for the duration of removal proceedings if the alien has committed a listed criminal offense or act of terrorism and does not qualify for the exception. Section 1226(a) — which expressly exempts from discretionary detention aliens who are covered by § 1226(c) — confirms this proposition. *See* 8 U.S.C. § 1226(a) (authorizing discretionary detention "[e]xcept as provided in subsection (c) of this section"). *See Jennings*, 138 S.Ct. at 846 ("together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.' § 1226(a)."). Once a final removal order is entered, the authority for continued detention shifts to 8 U.S.C. § 1231. Accordingly, by its plain language and structure, § 1226(c) mandates detention of certain criminal and terrorist aliens, like Plaintiffs, during their removal proceedings.

**B.      Congress determined, based on extensive investigation, that criminal aliens' flight risk and danger to the community are serious problems that justify mandatory detention.**

Section 1226(c)'s legislative history establishes that Congress fully intended to detain criminal aliens for the duration of their removal proceedings in order to remedy the failure of earlier discretionary-relief statutes and ensure the removal of these aliens. Congress made that legislative determination after conducting an extensive investigation — in an area in which congressional findings are entitled to particular judicial respect.

Congress has mandated detention of criminal aliens during removal proceedings since 1988.[5] Unsatisfied with those statutes, in the early 1990s, it again addressed the issue, finding that "substantial legislative and administrative reforms are urgently needed if the problems presented by criminal aliens in the United States are to be adequately addressed." S. Rep. No. 104-48, at 3 (1995). To this end, Congress resolved "to help ensure that aliens convicted of serious crimes are promptly removed from our society after serving their [criminal] sentence." H.R. Rep. No. 104-22, at 6 (1995).

Accomplishing that objective required consideration of the frequency with which criminal aliens, once located and placed in deportation proceedings, were absconding before their deportation. While the mandatory detention provisions instituted in 1988 had "prevent[ed]

---

[5] *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7343(a), 102 Stat. 4470 (8 U.S.C. § 1252(a)(2)). Section 1252(a)(2), directed that the Attorney General "shall take into custody any alien convicted of an aggravated felony upon completion of the alien's sentence for such conviction" and that "the Attorney General shall not release such felon from custody." 8 U.S.C. § 1252(a)(2) (1988). In 1990, Congress broadened the definition of "aggravated felony," subjecting more criminal aliens to mandatory detention. *See* Pub. L. 101–649, Tit. V, § 501(a), 104 Stat. 5048; *Demore*, 538 U.S. at 521. But Congress also added 8 U.S.C. § 1252(a)(2) (1988 & Supp. IV 1992), which allowed the release of "any lawfully admitted alien who has been convicted of an aggravated felony," so long as he demonstrated that he was not a flight risk or a danger. *See* Pub. L. 101–649, Tit. V, § 504(a)(5), 104 Stat. 5049; *Demore*, 538 U.S. at 521.

the very worst of the criminal aliens from further endangering the public and from being able to flee before deportation," the 1990 and 1991 amendments — which restored the possibility of bond for certain aggravated felons — had "weakened substantially" the government's efforts to deport criminal aliens and to protect public safety. *Criminal Aliens in the United States: Hearings Before the Permanent Subcomm. on Investigations of the Senate Committee on Governmental Affairs*, 103d Cong. 15, 26 (1993) ("1993 Senate Hearing") (staff report and testimony); *see* H.R. Rep. No. 104-22, at 12. Thus, "[m]any criminal aliens who are released pending their deportation *never appear for their deportation proceedings*." S. Rep. No. 104-48, at 23 (emphasis added); H.R. Rep. No. 104-469, at 123 (1996) (citing the INS's failure to detain aliens during their deportation proceedings as "[a] chief reason why many deportable aliens are not removed from the United States.").

Indeed, Congress had before it specific evidence about the consequences of allowing discretionary release of criminal aliens during their deportation proceedings. According to information collected in 1992, more than 20% of criminal aliens who were released on bond or otherwise not kept in custody throughout their deportation proceedings failed to appear for those proceedings. S. Rep. No. 104-48, at 2, 23; 1993 Senate Hearing at 21. The rate of flight doubled to 42% for criminal aliens whom the INS had not taken into custody at any time before a final order of deportation was entered. *Id*. Also, approximately 89% of nondetained aliens failed to report for their actual deportation. Dep't of Justice, Office of the Inspector General, Immigration and Naturalization Service, Deportation of Aliens After Final Orders Have Been Issued, Rep. No. I–96–03 (Mar. 1996). *See also id*. ("Based on the results of our sample of 1,058 cases, it is clear that most of the aliens actually deported were detained, and few of the nondetained aliens were deported. *Detention is key to effective deportation*.") (emphasis added).

Witnesses before Congress intimately familiar with the problem of absconding criminal aliens confirmed the importance of detaining those aliens pending deportation. Based upon its investigation, the General Accounting Office advised that "[w]e know that alternatives to detaining prisoners don't often work." *Hearing on H.R. 3333 Before the Subcomm. on Immigration, Refugees, and International Law, of the House Comm. on the Judiciary*, 101st Cong. 75 (1989) ( "1989 House Hearing"). Similarly, the Trial Division Chief of the Manhattan District Attorney's Office told the House Judiciary Committee that his "[n]umber one" recommendation for addressing this problem was to incarcerate alien aggravated felons for their crimes, and then "detain and deport" them. *Id*. at 120, 130. The Executive Director of the Justice Department office responsible for adjudicating deportation proceedings suggested that *no amount of bond* could ensure aliens' appearance at those proceedings. *Id.* at 35 (testimony of David Milhollan) (emphasis added). And the INS reported that its use of appropriated funds to take additional aliens into custody during their deportation proceedings in fiscal year 1996, "contributed greatly to [a] 25 percent increase in removals" of aliens during that year. *Criminal and Illegal Aliens, Subcomm. on Immigration and Claims of the House Comm. on the Judiciary*, 1996 WL 502071 (Sept. 5, 1996) (statement of David A. Martin, General Counsel, INS).

Such evidence led Congress ineluctably to conclude that discretionary release of deportable criminal aliens was undermining enforcement of the immigration laws, and that mandatory detention during removal proceedings would be an effective measure to ensure the aliens' availability for removal. *See e.g.* S. Rep. No. 104-48, at 32 ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond."). Thus, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of

1996 (Pub. L. 104–208, 110 Stat. 3009-546), which included the provision for mandatory

detention of certain criminal aliens during the pendency of their removal proceedings.

Congress's determinations about the necessity of mandatory detention are judgments

about immigration policy that deserve judicial deference. Although congressional determinations

underlying detention in aid of removal are not wholly beyond judicial review, "the judicial

branch must defer to executive and legislative branch decisionmaking in that area." *Zadvydas v.*

*Davis*, 533 U.S. 678, 695 (2001). In particular, judicial review of § 1226(c) "must take

appropriate account of the greater immigration-related expertise of the [political] Branch[es], of

the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to

enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration

matters." *Id*. at 700.

<u>Aliens subject to § 1226(c) mandatory detention.</u>

Section 1226(c) mandatory detention pending removal following an alien's participation

in terrorist activities or espionage (*see* 8 U.S.C. 1226(c)(1)(B) and (D)), commission of an

aggravated felony (*see* 8 U.S.C. 1226(c)(1)(B)), or commission of a specified controlled-

substance offense, a firearms offense, or (under certain circumstances) crimes of moral turpitude

(*see* 8 U.S.C. 1226(c)(1)(A), (B), and (C)). *See also* Defendants' summary of offenses, crimes,

and convictions referenced in 8 U.S.C. § 1226(c), ECF No. 415-2.

Congress did not require detention of *all* criminal aliens. In light of the practical

restriction on the former-INS's ability to house detained criminal aliens (*see* S. Rep. No. 104-48,

at 21), Congress limited the mandatory detention remedy to criminal aliens who had committed

crimes that Congress deemed *especially serious* because of their impact upon national security,

public safety and welfare, and enforcement of the immigration laws. *See e.g. Hearing on H.R.*

*723, et al., Before the Subcomm. on International Law, Immigration, and Refugees of the House Comm. on the Judiciary*, 103d Cong. 124, 125 (1994) (connecting visa and passport fraud to terrorism and drug-trafficking); 1989 House Hearing at 18 (statement of Jack Shaw, Assistant Commissioner, INS) (listing immigration fraud, along with crimes of violence and drug smuggling, as "activity [that] represents the greatest threat to public safety"); *id*. at 26 (racketeering is "major law enforcement problem[] involving aliens").

The four class members Plaintiffs highlighted in their Amended Complaint (*see* ECF No. 421 at 7–13) epitomize the types of criminal aliens that Congress intended to mandatorily detain. All four are aggravated felons and repeat, serious offenders. Three have criminal convictions for flouting court orders. And after the immigration system gave two of them second chances, both only escalated their criminal behavior.

For example, the lead Plaintiff in this case, Mark Anthony Reid, has "an extensive criminal history." Judge Ponsor's Jan. 9, 2014 Memorandum and Order, ECF No. 80 at 3. In 2010, Reid was of convicted of selling an illegal drug, third-degree burglary, and failure to appear, and he was sentenced to twelve years in prison, to be suspended after five. *Id*. Reid also has convictions for "*inter alia*, possession of narcotics, larceny, assault, interfering with an officer, driving with a suspended license, and selling illegal drugs." *Id*. Reid has continued to reoffend since an IJ released him on bond on February 25, 2014. On March 26, 2019, a Connecticut court issued a felony arrest warrant for Reid, charging first- and second-degree threatening and second-degree breach of the peace. *See* SMF at ¶ 5. One week later, Massachusetts State Police arrested Reid while he was driving and charged him with cocaine possession, being a fugitive from justice, and speeding. *Id*. at ¶ 6. He is currently detained at the Worcester County Jail in Massachusetts awaiting extradition to Connecticut on his felony

warrant. *Id*. at ¶ 8. In fact, the immigration court had to continue Reid's case for his counsel to resolve his inability to attend future hearing due to the pending criminal charges. *Id*. at ¶ 24.

Similarly, Jovanny Pichardo Gomez — who has multiple drug and drunk driving convictions — has violated a court order issued to assure public safety. *See* SMF ¶¶ 64–72. And Robert Williams was convicted of carrying a dangerous weapon and carrying a pistol without a permit, as well as possession of drugs near a prohibited place. *See* SMF ¶¶ 27, 32–34.[6]

Indeed, 104 of the 113 *Reid* class members identified between May 27, 2014 (*see Reid*, 22 F.Supp.3d at 84 (granting summary judgment)) and November 14, 2018 (the date Plaintiffs sent Defendants a list of *Reid* class members for discovery purposes) are aliens convicted of "aggravated felonies," as defined in 8 U.S.C. § 1101(a)(43). *See* Exhibit 2. These convictions include aggravated assault, arson, burglary, possession of dangerous weapons, embezzlement, extortion, forgery, fraud, homicide, kidnapping, robbery, sexual exploitation of minors, statutory rape, terrorism, and voluntary manslaughter. *See id*. Thus, the evidence before Congress — and the facts of this case — establish that criminal aliens' flight risk and danger to the community are serious problems that justify mandatory detention.

---

[6] Leo Felix Charles has a valid final order of removal and is not a *Reid* class member. However, if Charles's final order of removal is vacated, he would squarely fall under the group of aliens described under § 1226(c), as an alien convicted of assault, drug, and multiple firearms convictions. SMF ¶¶ 49–58. Charles has repeatedly failed to comply with his criminal court orders and violated the terms of his probation. *Id.* at ¶¶ 51, 53–55. Despite being granted Deferral of Removal under the Convention Against Torture (8 C.F.R. § 1208.17), upon release from state custody, he committed even more serious crimes. In 2011, after stabbing his female domestic partner with a kitchen knife over a phone bill, Charles was arrested for attempted murder, first-degree assault, and first-degree burglary. SMF at ¶¶ 57–58.

**C.      Section 1226(c) mandatory detention of criminal aliens for their entire removal proceedings comports with due process, and nothing supports Plaintiffs' request for automatic bond hearings.**

The Supreme Court has repeatedly recognized § 1226(c)'s constitutionality throughout removal proceedings — without imposing any time limitation on detention. Thus, the Court should reject Plaintiffs' bright-line rule requiring bond hearings or "reasonableness hearings" after six months' detention. Rather, constitutional concerns — to the extent that any exist in this context — depend on the unique facts and circumstances of each case bearing upon whether that particular detention continues to "serve its purported immigration purpose." *Demore*, 538 U.S. at 527. In *Demore*, the Supreme Court found that "Section 1226(c) mandates detention during removal proceedings for a limited class of deportable aliens" and did not interpret the statute to include any temporal limitations. 538 U.S. at 518–19, 526–29. And in *Jennings*, the Court held that "§ 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes." 138 S.Ct. at 847.

In the wake of *Jennings*, any constitutional analysis of § 1226(c) must acknowledge that the statute unambiguously requires detention for the entirety of removal proceedings, *see* 138 S.Ct. at 847, and must presume that such detention is constitutional, *see Morrison*, 529 U.S. at 607. Plaintiffs now ask this Court to determine whether § 1226(c) is *always* unconstitutional (or unreasonable) whenever proceedings extend beyond six months, regardless of the reasons why that has occurred. The answer is no.

      1. *Demore* precludes a finding that § 1226(c) detention automatically violates due process when it exceeds six months.

      The Supreme Court's decision in *Demore*[7] expressly forecloses a claim that § 1226(c) detention is unconstitutional in all instances, and "implicitly foreclose[s]" the notion that it always becomes unconstitutional after six-months. *Reid*, 819 F.3d at 497. In *Demore*, the alien (Kim) had already "spen[t] six months" in immigration custody before the Supreme Court upheld the constitutionality of his mandatory detention. 538 U.S. at 531. Moreover, as a result of the Court's reversal of the decision affirming Kim's release, he was returned to custody until his removal proceedings were completed, which the Supreme Court knew would take additional time. *See Demore*, 538 U.S. at 530–31. Kim had not yet had his merits hearing[8] (because he asked for a continuance), and if the IJ ordered him removed, he could still appeal to the BIA, and then the appellate court.

      *Demore* also rejected the analogy to *Zadvydas*'s six-month framework, thwarting any argument that § 1226(c) detention becomes unconstitutional after six months in all cases. *See Demore*, 538 U.S. at 516 (abrogating *Welch v. Ashcroft*, 293 F.3d 213 (4th Cir. 2002)). First, the

---

[7] Although after the *Demore* decision, EOIR acknowledged that it had "overestimated the average and median length of removal proceedings before an immigration judge for aliens in immigration custody who were charged with being removable on grounds that trigger mandatory detention" and "underestimated the time for appeals" to the BIA (*see* ECF No. 387-8 at 25), this has no bearing on *Demore*'s standing as good law. First, while the *Demore* Court considered the EOIR data, its holding that "detention during removal proceedings is a constitutionally permissible part of that process" was a legal determination based on existing case law. *See Demore*, 538 at 531 (citing *Wong Wing v. U.S.*, 163 U.S. 228, 235 [1896], *Carlson v. Landon,* 342 U.S. 524, [1952], *and Reno v. Flores,* 507 U.S. 292 [1993]) ("The INS detention of respondent, a criminal alien who has conceded that he is deportable, for the limited period of his removal proceedings, is governed by these cases."). Significantly, since learning of the data errors, the Supreme Court had ample opportunity to revisit its *Demore* holding, but it did not do so. Instead, it took *Demore* another step forward. *See Jennings*, 138 S.Ct. at 846.

[8] To determine an alien's removability and adjudicate any application for relief, the IJ conducts a "merits hearing," at which the alien has an opportunity to present evidence, including witness testimony, and an opportunity to cross-examine government witnesses. 8 U.S.C. § 1229a(b)(4).

Court determined that the § 1231 detention in *Zadvydas* no longer "serve[d] its purported

immigration purpose" because the aliens (who had already been ordered removed) could not be

removed due to an inability to obtain the necessary travel documents. *Id.* By contrast, the

Supreme Court emphasized that the detention of criminal aliens "*pending their removal*

*proceedings* … necessarily serves the purpose of preventing [them] from fleeing prior to or

during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens

will be successfully removed." 538 U.S. at 527–28. Second, *Zadvydas* involved "indefinite" and

"potentially permanent" detention because it "ha[d] no obvious termination point." *Demore*, 538

U.S. at 528–29 (quoting *Zadvydas*, 533 U.S. at 690–91, 697). By contrast, § 1226(c) authorizes

detention that is inherently temporary because it "has a definite termination point: the conclusion

of removal proceedings." *Jennings,* 138 S.Ct. at 848 (quoting *Demore*, 538 U.S. at 529).

It follows *a fortiori* that the Constitution does not impose a six-month, or any other

universal, limitation on § 1226(c) mandatory detention. Also, *Zadvydas* created the six-month

presumption of reasonableness for post-final order detention as a matter of statutory

interpretation, not as a constitutional mandate. 533 U.S. at 699. The justifications for adopting

that presumption in *Zadvydas* are absent here because the two cases are "materially different."

*Demore*, 538 U.S. at 527; *Jennings,* 138 S.Ct. at 848. And the *Zadvydas* Court did not suggest

that the Due Process Clause itself imposed a six-month limitation on the duration of mandatory

immigration custody as a general matter. Rather, the Court concluded that six months was a

"presumptively reasonable" time during which detention after entry of a final order of removal

continued to serve the particular immigration purpose at issue there: to effectuate the final order

that the alien be removed. *Zadvydas*, 533 U.S. at 701. Even then, the Court did not impose a rigid

six-month rule, requirement of a bond hearing, or any procedure placing the burden of proof on

the Government to demonstrate the necessity of continued detention. The alien could continue to be detained beyond that point — without a bond hearing — unless the alien could provide good reason to believe that there was no significant likelihood of his removal in the reasonably foreseeable future. *Id.*; *see also Clark v. Martinez*, 543 U.S. 371, 387 (2005) (O'Connor, J., concurring) (emphasizing the *Zadvydas* 6-month presumption is "just that—a presumption" and noting "[i]t is conceivable, [], that a longer period is 'reasonably necessary,' to effect removal" and that detention beyond six months "will be lawful"). Thus, due process requires neither bond hearings nor "reasonableness hearings" after six months' detention in either the pre-final order stage (*Demore*) or post-final order stage of removal (*Zadvydas*).

Beyond this, the Court's adoption of a requirement for bond hearings after six months' detention, or any bright-line standard, would create an incentive for criminal aliens to seek continuances or file meritless applications for relief in their removal proceedings to draw out their detention time in order to gain access to a bond hearing that they are not statutorily entitled to. A mandate that all such aliens must be given bond hearings after six months would leave an "unprotected spot in the Nation's armor" *Zadvydas*, 533 U.S. at 695–96 (quoting *Kwong Hai Chew v. Colding*, 344 U.S. 590, 602 (1953)), that Congress could not close. It would create a powerful incentive for aliens to come to the U.S. and then prolong removal proceedings in the hope of obtaining a bond hearing and release, potentially absconding into the U.S. Further, setting a six-month mark for a bond hearing would incentivize criminal aliens subject to mandatory detention to abuse the many legitimate protections incorporated into removal proceedings, such as continuances, filing applications for relief from removal, and appealing removal orders, in order to reach the six-month mark and obtain release from custody —  in contravention of Congress's clear statutory language. That cannot be the correct result, and as the

16

Court previously recognized, the Supreme Court's precedents are to the contrary. *Cf. Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 498 (9th Cir. 1984) (allowing an alien who illegally renters after removal to challenge his reinstated removal order "would create a new and wholly unwarranted incentive for aliens who have previously been removed to reenter the country illegally in order to take advantage of such a self-help remedy. It would also make a mockery of aliens who do respect our laws and wait patiently outside our borders seeking lawful admission.'"). Indeed, Congress recognized such delay tactics do exist, noting that "[a]fter their appeals have been exhausted, some criminal aliens delay deportation for additional years by filing dubious asylum claims." S. Rep. 104–48, at 2 (1995); *see also id*. at 28 ("Some criminal aliens attempt to prevent their deportation by filing an asylum claim at some point before, during or after their deportation hearing. … The filing of an asylum claim starts a separate process that can *easily take years to resolve*.") (emphasis added).

Additionally, the practical effect of receiving a bond hearing and subsequent release would shift the criminal alien's removal proceedings from EOIR's expedited detained immigration docket to the non-detained docket, which could allow him to remain free in the U.S. for years awaiting the outcome of his case. *See* Dep't of Justice, *Administrative Review and Appeals: FY 2018 Budget Request at a Glance*, 2 (EOIR prioritizes removal proceedings for detained aliens); *see* Memorandum: Case Priorities and Immigration Court Performance Measures from James R. McHenry III, Director to The Office of the Chief Immigration Judge, EOIR at 2 available at https://www.justice.gov/eoir/page/file/1026721/download ("EOIR has always designated detained cases as priorities for completion."). For example, Reid's removal proceeding is now in its fifth year since his release on bond in 2014, because it is now on the non-detained calendar.

EOIR's designation of detained cases as a priority indicates an expectation that such cases will be completed expeditiously and without undue delay, consistent with due process. *See* Memorandum: Case Priorities and Immigration Court Performance Measures, *supra*. EOIR has always had a goal of completing 80% of all non-status detained removal cases within 60 days of DHS's filing the charging document. *See* Dep't of Justice FY17 Annual Performance Report and FY2019 Performance Plan at 44 (Feb. 2018) available at https://www.justice.gov/doj/page/file/1033761/download#goals. EOIR also encourages IJs to limit the number of continuances granted in removal cases, especially those involving detained aliens. *See* EOIR, Office of the Chief Immigration Judge OPPM 17-01: Continuances available at https://www.justice.gov/eoir/file/oppm17-01/download. Similarly, the BIA prioritizes the adjudication of appeals filed in detained cases. *See* 8 C.F.R. 1003.1(e)(8) (BIA appeals should be disposed of within 90 days or 180 days … "with a priority for cases … involving detained aliens.").[9] Indeed, in 2017 the BIA exceeded its goal of completing 90% of detained appeals within 150 days. *See* Dep't. of Justice FY17 Annual Performance Report at 45. Additionally, an alien can always file a motion to advance his hearing date or appeal before the BIA if he believes his detention has become prolonged. *See* Immigration Court Practice Manual Ch. 5 at 109 (2018) available at https://www.justice.gov/eoir/page/file/1084851/download. Notwithstanding EOIR's efforts to prioritize detained cases, an IJ must "safeguard due process above all [else]." OPPM 17-01: Continuances at 3. Simply put, statistics alone do not tell the whole story. EOIR provides

---

[9] ICE policy is similarly for its attorneys to seek continuances in detained cases only when "absolutely necessary," and to seek to expedite any applications for adjustment of status or other relief that the alien might choose to file with U.S. Citizenship and Immigration Services during removal proceedings. Office of the Principal Legal Advisor, ICE, *Continuances and Briefing Extensions Before EOIR* (Jul. 1, 2014); *see* ICE, *Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions* 1–3 (Aug. 20, 2010).

robust process and the passage of time in removal proceedings typically reflects the alien's

decision to avail himself of various protections available in immigration court and the IJ's efforts

to ensure due process while adjudicating the alien's claims for relief from removal.

> 2. The justifications for detaining a criminal alien during his removal proceedings
> do not evaporate at any fixed point in detention, much less the six-month mark.

Mandatory detention under § 1226(c) during removal proceedings is constitutional where

it continues to "serve its purported immigration purpose." *Demore*, 538 U.S. at 527 (citing

*Zadvydas*, 533 U.S. at 690); *see Flores*, 507 U.S. at 306; *Carlson,* 342 U.S. at 540; *Wong Wing*,

163 U.S. at 235–36; *see also Demore*, 538 U.S. at 532 (Kennedy, J., concurring). As *Demore*

illustrates, that detention mandate does not cease to be justified whenever the removal

proceedings to which the detention is tied last six months, or for any other set amount of time.

The government's interest in removing a criminal alien (if he is ordered removed at the end of

the proceedings) does not dissipate at the six-month mark (or any other fixed point) of those

removal proceedings. Whether an alien will be ordered removed cannot be conclusively

established until the end of removal proceedings because those proceedings are the "sole and

exclusive" means for making that determination. 8 U.S.C. § 1229a(a)(3). But the prospect of

removal, and the government's interest in effectuating it, thus remain concrete throughout.

The government's interest also becomes stronger (and a criminal alien's liberty interest

weaker) when an IJ denies any applicable applications for relief and orders him removed. In such

case, the criminal alien's risk of flight is heightened. At that point, the government has devoted

considerable resources to completing those proceedings; the IJ has concluded that the criminal

alien is removable and does not warrant relief from removal; and further review will ordinarily

leave the removal order intact. If a criminal alien nonetheless makes the "difficult judgment[]" to

appeal to the BIA, he does so knowing that it will extend his removal proceedings and continue

his mandatory detention. *Demore*, 538 U.S. at 530 n.14 (citation omitted). A criminal alien thus has a particularly weak interest in being released into the U.S. while seeking BIA review of an IJ removal order; weaker still when he files a petition for review and obtains a stay of removal, rather than litigating from abroad; and weaker further still when, at any stage, he does not dispute (or cannot reasonably dispute) that he is removable and thus lacks any substantive right to remain. Moreover, those factors vary from case to case, further underscoring that the Constitution does not impose any set time limit on mandatory detention.

Section 1226(c) detention also does not cease to be justified when a criminal alien makes choices during the proceedings that necessarily add time to the resolution of his case — and therefore to the detention. For example, in *Demore*, the alien's "removal hearing was scheduled to occur" after five months, but the Court noted that "[he] requested and received a continuance to obtain documents relevant to his withholding application." 538 U.S. at 531 n.15. The Court viewed such added detention time reasonably consumed in disposing of the appeal as fully justified. "As we have explained before," the Court stated, "'the legal system … is replete with situations requiring the making of difficult judgments as to which course to follow,' and, even in the criminal context, there is no constitutional prohibition against requiring parties to make such choices." *Id*. at 530 n.14 (quoting *McGautha v. California*, 402 U.S. 183, 213 (1971)); *see Chaffin v. Stynchcombe*, 412 U.S. 17, 30–31 (1973).

Justice Kennedy's concurrence in *Demore* reflects a similar understanding. He viewed the constitutionality of continuing detention without a bond hearing as depending on why detention is continuing: If there were an "unreasonable delay *by the [Immigration and Naturalization Service (INS)]* in pursuing and completing deportation proceedings," he explained, it "could become necessary" to ask whether "the detention is not to facilitate

20

deportation, or to protect against risk of flight or dangerousness, *but to incarcerate for other reasons.*" *Id.* at 532–33 (emphases added). Justice Kennedy could not draw such an inference, however, "from the circumstances of" *Demore* itself. 538 U.S. at 533. The clear implication is that the reasonable continuation of removal proceedings occasioned by an alien's choices — including seeking continuances, relief from removal, or appellate review — does not undermine the detention's constitutionality. As long as the added time is reasonably needed to adjudicate the case (not prolonged pointlessly or to punish), the ongoing detention continues to be constitutionally justified by the interests in "protect[ing] against risk of flight or dangerousness." *Id.* at 532–33; *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991) ("Although this litigation strategy is perfectly permissible, we hold that [the alien] may not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process."). An arbitrary six-month bond hearing requirement, thus, cannot be squared with the constitutional inquiry *Demore* requires.

Furthermore, the risk that a criminal alien will commit further crimes or otherwise present a danger to the community if released will ordinarily remain constant until removal proceedings conclude. *See Preap*, 2019 WL 1245517, at *10 (citing *Demore*, 538 U.S. at 513) ("Congress enacted mandatory detention precisely out of concern that such individualized hearings could not be trusted to reveal which 'deportable criminal aliens who are not detained' might 'continue to engage in crime [or] fail to appear for their removal hearings.'"). No basis exists to believe that risk of harm would dissipate at six months in any one case, much less in every single case. Similarly, the risk that a criminal alien, if released, will fail to appear for removal proceedings does not dissipate at the six-month mark. Indeed, the government's interest in keeping the alien in custody (and the alien's incentive to abscond) will typically *increase* over

time as removal proceedings progress towards their completion and the likely conclusion that the alien will be ordered removed. A criminal alien on the cusp of removal has a greater incentive to abscond than one who is at the beginning of his proceedings.

> 3. The liberty interests of criminal aliens detained under section 1226(c) are <u>ordinarily substantially diminished and suitably addressed by *Joseph* hearings.</u>

As Congress has recognized, "criminal aliens have already been afforded all the substantial due process required under our system of criminal justice before being convicted beyond a reasonable doubt of a felony." S. Rep. No. 104-48, at 1. *See also Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (right to counsel who must advise the defendant of possible immigration consequences of a guilty plea). And the criminal grounds on which an alien is subject to mandatory detention are also the grounds on which the alien is removable. *See* 8 U.S.C. § 1226(c)(1). Ordinarily, removability is established, beyond dispute, by the alien's judgment of conviction. But an alien is entitled to a *Joseph* hearing to seek to establish that the government is substantially unlikely to prevail in demonstrating that his conviction is one that subjects him to mandatory detention. *See Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999); 8 C.F.R. § 1003.19(h)(2)(ii). An alien may appeal an adverse *Joseph* decision to the BIA. 8 C.F.R. § 236.1(d)(3). If the alien prevails, § 1226(c) will not apply and the alien will be eligible for release on bond under § 1226(a). Thus, whenever a criminal alien remains detained under § 1226(c), he has either forgone a *Joseph* hearing, or the IJ (or BIA) has found, on an individualized basis, "at least some merit to the [government's] charge." *Demore*, 538 U.S. at 531 (Kennedy, J., concurring). [10]

---

[10] What is more, the class members here have already experienced a bevy of procedural and substantive safeguards, which prevent arbitrary deprivations of liberty. For instance, detention pending removal proceedings is by definition accompanied by many protections in those proceedings themselves. *See* 8 U.S.C. §§ 1101(b)(4), 1229a. Among others, the alien enjoys

Of course, the government allows aliens in immigration detention pending removal proceedings to end those proceedings, at any time, by accepting a final order of removal, seeking voluntary departure, or, in some circumstances, by simply returning to his home country. An alien who files a petition for review in a court of appeals after the BIA has entered a final order of removal can depart and continue to challenge the removal order from abroad. *See Nken v. Holder*, 556 U.S. 418, 424 (2009).

Not surprisingly, many criminal aliens detained under § 1226(c) concede they are removable. Thus, while such aliens often nonetheless seek *relief* from removal, in the vast majority of cases "he or she has no right under the basic immigration laws to remain in this country." *Zadvydas*, 533 U.S. at 720 (Kennedy, J., dissenting); *see Demore*, 538 U.S. at 523 n.6 (distinguishing between being "*deportable*" and seeking relief from removal that may mean the alien will not "*ultimately be deported*").

II.     **IN THE UNUSUAL CASE WHERE DETENTION IS NO LONGER SERVING ITS IMMIGRATION PURPOSE PRIOR TO THE END OF REMOVAL PROCEEDINGS, THE PROPER MECHANISM FOR RELIEF IS AN INDIVIDUAL PETITION FOR WRIT OF HABEAS CORPUS.**

Given that § 1226(c) — indisputably constitutional on its face — requires detention throughout removal proceedings except for witness-protection purposes, it is beyond cavil that, in the vast majority of cases, mandatory detention never becomes constitutionally unreasonable.

---

notice of and an opportunity to dispute the charges against him (8 U.S.C. § 1229a); a right to be informed of protection and relief eligibility (8 C.F.R. § 1240.11(c)(1)); the ability to seek continuances; the ability to seek relief or protection from removal even if he is deportable or inadmissible (8 U.S.C. §§ 1158(a), 1229b, 1231(b)(3)); adjudication by an IJ (8 U.S.C. § 1101(b)(4)); and several layers of appellate review (8 U.S.C. § 1229a(c)(5); 8 C.F.R. §§ 1003.1(b), 1003.38(a)).

To minimize interim detention when aliens choose to litigate, class members can make expeditious relief claims, request first available hearings, and move to expedite their proceedings. EOIR has indicated that it prioritizes removal proceedings for detained aliens. *See* Section I.C.1., *supra*.

And given that the Supreme Court has twice held that § 1226(c) detention is not limited to six months, *Demore*, 538 at 531 (due process); *Jennings*, 138 S.Ct. at 845, 847 (statutory interpretation), the constitutionality of § 1226(c) detention cannot be decided simply and solely by looking at a calendar. It follows that such detention certainly does not become automatically unreasonable in *every* case after six months (or at any other set time), no matter the individual circumstances of the case.

The key inquiry is whether continued detention "serve[s] its purported immigration purpose." *Demore*, 538 U.S. at 527; *see also Reid*, 819 F.3d at 498–99. Section 1226(c) "detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 528. Such detention will ordinarily serve those purposes for the full duration of removal proceedings because a criminal alien's danger to the community will typically remain constant and the government's interest in retaining custody over the alien to effectuate removal will usually increase over time.

Accordingly, whether continued detention continues to serve its immigration purpose with regard to any particular alien, by definition, involves assessment of the unique facts and circumstances surrounding that person's case — and any bright-line time limit is anathema to this case-specific analysis. *See Reid*, 819 F.3d at 497 ("Taken together, *Zadvydas*, *Demore*, and the inherent nature of the 'reasonableness' inquiry weigh heavily against adopting a six-month presumption of unreasonableness."). Accordingly, the only resolution of this class action is to answer Plaintiffs' common question in the negative.

As the Supreme Court has "stressed repeatedly," "due process is flexible,'" and "it 'calls for such procedural protections as the particular situation demands.'" *Jennings*, 138 S.Ct. at 852

24

(citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). Due process requires an individualized assessment of numerous factors including the "interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures." *Morrissey*, 408 U.S. at 481; *Landon*, 459 U.S. at 34; *see Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

The individual characteristics and factual differences among the class members make a bright-line answer to the due-process question untenable. *See Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."). For example, the class includes aliens who claim they are not removable and, thus, should not be in removal proceedings, and those who concede they are removable and instead merely seek relief from removal; aliens who seek different kinds of relief; aliens who expeditiously pursued their claims and others who did not; aliens who have been ordered removed by an IJ or the BIA, and those who have not; aliens who appealed; aliens who filed a petition for review; lawful permanent residents and aliens who have no substantial contacts to the U.S.; aliens with extensive criminal records and aliens with fewer contacts with the criminal justice system; and aliens who have been subject to different kinds of processes along the way.

Beyond this, the class also includes individuals who have been ordered removed by an IJ, had their appeal dismissed by the BIA, and are imminently removable unless (in the rare instance) they file a petition for review and receive a stay of removal from an appellate court. For all such aliens, the government's interest in continued detention is highest and accordingly the

25

alien must demonstrate a weighty liberty interest in order to bring a successful due-process challenge. But this required give-and-take between factors cannot be uniformly or categorically conducted as to both an alien on the precipice of removal and an alien whose initial removal proceedings are still underway. These factual differences meaningfully change the way in which the due-process analysis is conducted. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) ("The requirements of due process are flexible and call for such procedural protections as the particular situation demands.").

The Supreme Court's Speedy Trial Clause precedent illustrates the point that a rigid time cap is inappropriate for this necessarily individualized analysis. The Sixth Amendment expressly provides a right "to a speedy and public trial." In interpreting that guarantee, the Supreme Court has unanimously rejected a rule "that the government must be ready for trial within six months of the date of arrest, except in unusual circumstances." *Barker v. Wingo*, 407 U.S. 514, 523 (1972). "We cannot definitely say how long is too long," the Court stated, "in a system where justice is supposed to be swift but deliberate." *Id*. at 521; *see id*. at 538 (White, J., concurring) ("[C]ases will differ among themselves as to the allowable time between charge and trial.").

The *Barker* Court found "no constitutional basis for holding" that the right "can be quantified into a specified number of days or months." 407 U.S. at 523. Adopting such a rule, the court concluded, "would require this Court to engage in legislative or rulemaking activity," "rather than in the adjudicative process." *Id*. The "inflexible" approach of a "fixed-time period," the court reasoned, thus "goes further than the Constitution requires." *Id*. at 529. Instead, the court held that "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Id*. at 522. That analysis applies *a fortiori* here, where (unlike in *Barker*) Plaintiffs' bright-line rule would encompass multiple layers of appellate

review, available to the alien depending on his own litigation choices. This comparison is especially salient because the protections that apply in a criminal-trial context do not apply in a removal hearing where the purpose is not to punish past transgressions but to end to a continuing violation of the immigration laws. *See* Section III, *infra*.

Thus, in an extraordinary case, the appropriate safety valve is an as-applied constitutional challenge in an individual habeas action. The same length of detention may be constitutionally reasonable for one detainee but unreasonable for another. Indeed, in its withdrawn opinion, the First Circuit determined that the "individualized approach adheres more closely to legal precedent than the extraordinary intervention requested by Petitioner" — despite the bright-line rule's "practical advantages." *Reid*, 819 F.3d at 498.

In addition to its fidelity to Supreme Court precedent, the individualized approach has a number of other assets. If courts evaluate individual cases in the context of as-applied challenges, the number of viable cases should be small, a result consonant with the evidence Congress considered in adopting § 1226(c). *See Demore*, 538 U.S. at 528. In contrast, a bright-line time limit would "go[] further than the Constitution requires," *Barker*, 407 U.S. at 529, and therefore fail to accord the proper deference to the statute. Under Plaintiffs' bright-line rule, many aliens would obtain a bond hearing — and many of those would be granted bond and released — notwithstanding that their detention pending removal proceedings is statutorily required and constitutional. This result thwarts § 1226(c)'s purpose: "preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed" (*Demore*, 538 U.S. at 528). Moreover, if there is delay, an alien can ask the IJ, BIA, or court of appeals to move faster. *See Barker*, 407 U.S. at 530–31.

27

Further, IJs do not have the authority to find acts of Congress unconstitutional. *Matter of C-*, 20 I. & N. Dec. 529, 532 (BIA 1992). In contrast, "federal courts have the institutional competence to make fact-specific determinations," *Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199, 1217 (11th Cir. 2016), vacated, 890 F.3d 952 (11th Cir. 2018), as demonstrated by their ability to apply case-specific standards under the Speedy Trial Clause and as-applied challenges to prolonged pretrial detention. *Cf. Flores*, 507 U.S. 314 (observing that there was "no evidence … that habeas corpus [wa]s insufficient to remedy particular abuses" in terms of detention for "undue periods"). Thus, the district court can examine all of the relevant factors and take into account the reasons why that outlier case is an outlier in the first place. And any complaint about the speed of the habeas remedy are belied by the fact that the instant class action is in its fifth year — and several *Reid* class members have already filed individual habeas petitions.

What is more, Plaintiffs' newly-requested relief — an entitlement to a newly-created "reasonableness" hearing that would occur automatically after six-months of detainment, no matter the individual's circumstance — will create a flood of unnecessary litigation, which will further strain an already-overburdened immigration court system. Under Plaintiffs' proposal, after hearing from witnesses and collecting evidence, the immigration court must conduct an individualized, case-specific analysis regarding whether the detention is "reasonable." If it finds that detention is unreasonable, it must hold a bond hearing, where it will again hear from witnesses and collect evidence to make another individualized determination on flight risk and dangerousness. These numerous, time-consuming proceedings would cause IJs' caseloads to balloon even further beyond their headline-grabbing backlog — and further increase the time the very same detainees will have to wait for individualized hearings on the merits of their removal proceedings. And given Congress's unquestionable mandate for detention to last throughout

28

removal proceedings, the vast majority of aliens' detentions will not violate due process after only six months — a limitation "draw[n] … out of thin air" (*Jennings*, 128 S.Ct. at 851).

Beyond this, the Supreme Court rejected a claim that the government should employ individual bond hearings, rather than mandatory detention, because the government has never shown that individualized bond hearings would be ineffective in accomplishing § 1226(c)'s purpose or would be burdensome. *Demore*, 538 U.S. at 528. The Court reasoned, "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Id. See also Flores*, 507 U.S. at 315 (quoting *Schall v. Martin*, 467 U.S. 253, 281 (1984)) ("It may well be that other policies would be even better, but 'we are [not] a legislature charged with formulating public policy.'").

Notably, even if the Court granted the requested relief, none of the named Plaintiffs would benefit, since none are in immigration detention. *See* ECF No. 446 at ¶¶ 5, 9, 29. Accordingly, this Court should grant summary judgment in Defendants' favor.

## III.    BECAUSE THE EIGHTH AMENDMENT DOES NOT APPLY TO IMMIGRATION CASES, § 1226(C) DETENTION DOES NOT VIOLATE THE EXCESSIVE BAIL CLAUSE.

The Court should reject Plaintiffs' excessive bail claim because the Eighth Amendment does not apply to immigration detention. The right not to be subjected to excessive bail is conferred by the Eighth Amendment and implemented, so far as federal criminal defendants are concerned, in the Bail Reform Act. 18 U.S.C. § 3142; *see U.S. v. Salerno*, 481 U.S. 739, 753–54 (1987). The Eighth Amendment's bail clause does not say that a person detained by the government is entitled to release on bail — only that he may not be subjected to excessive bail as a condition of release. *Id*. at 752. The Court has suggested that the bail clause requires that "the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil" from releasing the person. *Id*. at 754.

29

But *Salerno* was a criminal case, and the Court has never held that persons detained in civil proceedings, such as removal or deportation proceedings, are entitled to release on bail. *Carlson*, 342 U.S. at 545–46. Removal proceedings are a purely civil action. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). The purpose is not to punish past transgressions but to put an end to a continuing violation of the immigration laws. Thus, various protections that apply in the context of a criminal trial do not apply in a removal hearing. *See Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) (Eighth Amendment not applicable to person detained for deportation; constitutional claims for such individuals arise under the Due Process Clause); *Avramenkov v. I.N.S.*, 99 F. Supp. 2d 210, 218 (D. Conn. 2000) ("pre-removal detention is not punishment because it is incidental to the government's power to control its border"). Further, the *Demore* Court did not mention the bail clause; instead, it based its analysis solely on the Due Process Clause. Thus, because the Eighth Amendment does not apply to immigration detention, the Court may not grant the class relief on this basis.

Nevertheless, Plaintiffs' Excessive Bail Clause claim fails for the same reason their bond-hearing claim fails: Plaintiffs are diverse group of detainees, and any excessive-bail analysis is wholly dependent on the individual "circumstances" of each case.

IV.    **TO THE EXTENT THAT THE COURT FINDS THAT ANY TYPE OF HEARINGS ARE WARRANTED, THE GOVERNMENT IS NOT REQUIRED TO BEAR THE BURDEN OF PROOF — AND CERTAINLY NOT BY CLEAR-AND-CONVINCING EVIDENCE — AND PLAINTIFFS ARE COLLATERALLY ESTOPPED FROM ARGUING OTHERWISE.**

Plaintiffs are collaterally estopped from re-litigating their Fifth Amendment due-process challenge to the bond hearing framework under 8 U.S.C. § 1226(a), since this has been a central issue of this case and has already been fully litigated. *See Reid*, 22 F. Supp. 3d at 92–93 (considering and rejecting the argument that a "clear and convincing" standard should apply in bond hearings, and applying the burden and standard of review followed in bond hearings under

§ 1226(a)). Because the First Circuit reversed and remanded the district court's decision on other grounds, and declined to address the district court's holding on the burden of proof issues, that holding remains the law of the case.

In addition to the class members presenting the same issue in *Reid*, 22 F. Supp. 3d at 92, they again attempted to argue this issue through a different class member, Damion Brown, in *Brown v. Smith*, 14-CV-30184-MAP, at 11–12 (Sept. 29, 2015) (Ponsor, J.) (Attached hereto as Exhibit 8); *id*. at 12 (no dispute exists that Brown was a *Reid* class member). The court correctly barred the class members' attempt to re-argue that the government has the burden of demonstrating that a criminal alien should be detained by clear and convincing evidence at a bond hearing. *Id*. at 12–17. Indeed, the court granted the government's motion to dismiss Brown's due-process claim "because Petitioner is collaterally estopped from claiming now that Respondents must satisfy a clear and convincing standard at his bond hearing[.]" *Id*. at 17.[11]

And the class recently tried to present the argument a third time before the Court, this time through class member Claude Bonnet. *See Bonnet v. Smith*,19-10417-PBS. But consistent with *Reid* and *Brown*, Plaintiffs remain collaterally estopped from re-litigating this argument.[12]

Ignoring precedent in this case, Plaintiffs *again* ask the Court to require Defendants to provide either bond hearings at which the government must prove danger and flight risk by clear and convincing evidence, or alternatively, individualized reasonableness hearings where the

---

[11] Therefore, Defendants incorporate those same arguments in this Response by reference. *See* No. 3:14-cv-30184-MAP, ECF Nos. 9, 10, 12-1, 33, 43.

[12] All four collateral estoppel elements are indisputably satisfied. *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997). Specifically: (1) this issue is the same in the earlier action; (2) this issue was actually litigated; (3) the court issued a valid and binding final judgment; and (4) the court's determination of the issue was essential to the judgment. *Id*.; *see Reid*, 22 F. Supp. 3d at 91; Exhibit 8 at 12–17.

Defendants also incorporate by reference Respondents' briefing in *Bonnet v. Smith*,19-10417-PBS, ECF No. 15 at 25–30.

government must prove by clear and convincing evidence that no-bond detention remains reasonable, followed by bond hearings. *See* ECF No. 421 at 19. But the Constitution does not require the government to bear the burden of establishing that the alien will be a flight risk or danger — much less by clear-and-convincing evidence — to justify temporary detention pending removal proceedings. The Supreme Court has consistently affirmed the constitutionality of detention pending removal proceedings notwithstanding that the government has *never* borne the burden to justify that detention by clear-and-convincing evidence. *See e.g. Demore*, 538 U.S. at 531; *Flores*, 507 U.S. at 306; *Carlson*, 342 U.S. at 538; *see Zadvydas*, 533 U.S. at 701. In fact, the Supreme Court has repeatedly upheld detention pending removal proceedings on the basis of a categorical, rather than individualized, assessment that a valid immigration purpose warranted interim custody. *Flores*, 507 U.S. at 306; *Carlson*, 342 U.S. at 538.

Furthermore, *Demore* upheld mandatory detention under § 1226(c), which expressly puts the burden on the alien even in the only situation in which release is permitted — for witness-protection purposes. Section 1226(c) altogether prohibits release of the specified criminal or terrorist aliens, except if release is "necessary" for witness protection and "the alien satisfies the Attorney General" that he "will *not* pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2) (emphasis added). And in *Zadvydas*, the Court placed the burden on the alien, who is subject to potentially indefinite detention following entry of a final order of removal, to show "that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701.

Instead, as Judge Ponsor held in 2014, any remedy must be limited to those available to detainees under § 1226(a), which governs the detention and release of other aliens arrested inside the U.S. *See Reid*, 22 F. Supp. 3d at 93 ("Section 1226(a) provides a reasonably effective way for

class members to obtain the individualized assessment they are entitled to, without giving them heightened or special treatment that due process does not require."). This makes sense, since "individuals who committed a § 1226(c) predicate offense should not receive *more* protections than § 1226(a) detainees." *Id.*[13]

Notably, *Jennings* found that a requirement that the government prove by clear and convincing evidence that the alien's continued detention is necessary would be inconsistent with § 1226(a)'s text. 138 S. Ct at 847–48 ("[n]othing in § 1226(a)'s text—which says only that the Attorney General 'may release' the alien 'on … bond'—even remotely supports the imposition of those requirements."). It rejected the Ninth Circuit's imposition of "procedural protections that go well beyond the initial bond hearing established by existing regulations," which included periodic bond hearings every six months in which the Attorney General must prove by clear and convincing evidence that the alien's continued detention is necessary. *Id.* at 847. Indeed, even the dissenting Justices in *Jennings* found that "those bail proceedings should take place in accordance with the customary rules of procedure and burdens of proof rather the special rules that the Ninth Circuit imposed." *Id.* at 882 (Breyer, J., dissenting). Unsurprisingly, when the Supreme Court remanded *Jennings* for consideration of the constitutional issues, the Ninth Circuit directed the district court to, "reassess and reconsider both the clear and convincing

---

[13] Under § 1226(a), Every such alien is individually considered for release on bond. 8 C.F.R. § 236.1(c)(8). If the officer denies bond (or sets a bond the alien thinks is too high), the alien may ask an IJ for a redetermination of the custody decision. 8 C.F.R. §§ 236.1(d)(1), 1003.19, 1236.1(d)(1). The alien may appeal the IJ's custody redetermination to the BIA. 8 C.F.R. § 236.1(d)(3)(i), 1236.1(d)(3)(i). An alien who remains detained under § 1226(a) may later obtain another custody determination if and when "circumstances have changed materially since the prior bond redetermination." 8 C.F.R. § 1003.19(e). Since its 1999 decision in *Matter of Adeniji*, 22 I. & N. Dec. 1102, 1111-13 (BIA 1999), the BIA has interpreted federal regulations to mean that the burden of proof is on the alien in bond hearings under § 1226(a) to establish that he or she is not a threat to national security, a danger to the community, or a flight risk. *See Matter of Guerra*, 24 I. & N. Dec. 37, 38, 40 (BIA 2006) (reaffirming *Matter of Adeniji*).

evidence standard and the six-month bond hearing requirement." *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018). *See also Barbot v. Warden Hudson County Correctional Facility*, 906 F.3d 274, 276–77, 279 (3d Cir. 2018) (effectively holding that § 1226(a) and its implementing regulations (as interpreted by the BIA) satisfy a detainee's due process rights).

These decisions, *Nielsen v. Preap*, and further legal issues, call into question this Court's findings in other cases that due process requires the government to carry the burden of proof in § 1226(a) bond proceedings. *See Doe v. Tompkins*, No. 1:18-cv-12266, 2019 U.S. Dist. LEXIS 22616 at *1–2 (D. Mass. Feb. 12, 2019); *Pensamiento v. McDonald*, 315 F.Supp.3d 684 (D. Mass. 2018).[14]

After *Doe* and *Pensamiento*, in *Nielsen v. Preap*, the Supreme Court repeatedly emphasized that the alien — not the government — carried the burden of proof in a § 1226(a) bond hearing. *See Preap*, 2019 WL 1245517, at *3 ("aliens may secure their release by proving to the satisfaction of a Department of Homeland Security officer or an immigration judge that they would not endanger others and would not flee if released from custody."); *id*. ("and the alien may secure his release if he can convince the officer or immigration judge that he poses no flight risk and no danger to the community"); *id*. at *22 (Breyer, J., dissenting) (a bail hearing "simply permits the person held to demonstrate that, if released, he will neither run away nor pose a threat"). *Preap* is, thus, a far cry from this Court's holding that "[r]equiring a non-criminal alien to prove that he is *not* dangerous and *not* a flight risk at a bond hearing violates the Due Process Clause." *Pensamiento*, 315 F.Supp.3d at 692.

---

[14] Notably, in *Pensamiento*, the Court rejected the petitioner's argument that due process required the government to meet this burden by clear and convincing evidence. *Id*. at 693.

Further, *Pensamiento* erred by applying two non-immigration Supreme Court decisions involving state statutes that permitted civil commitment (*Foucha v. Louisiana*, 504 U.S. 71 (1992) and *Addington v. Texas*, 441 U.S. 418 (1979)), to the context of immigration bond hearings under § 1226(a). 315 F.Supp. at 691–63. First, by directly applying non-immigration civil confinement cases in the immigration context without further analysis, the Court did not acknowledge longstanding Supreme Court precedent holding that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 522 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). In so finding, the *Demore* majority expressly rejected the dissent's view, relying on *Addington* and *Foucha*, that "the only reasonable starting point [for analyzing detention under § 1226] is the traditional doctrine concerning the Government's physical confinement of individuals" (538 U.S. at 547, 550 (J. Souter, dissenting)). *Demore*, 538 U.S. at 522. Second, *Pensamiento* ignored the fact that *Addington* and *Foucha* presented situations involving potentially *indefinite* confinement. *See Foucha*, 504 U.S. at 82; *Addington*, 441 U.S. at 419–20. Conversely, as the Supreme Court held in *Demore* while addressing § 1226(c)'s constitutionality, § 1226 detention has "a definite termination point"—namely, the conclusion of removal proceedings. 538 U.S. at 528–29.

Similarly, in *Doe*, the Court entirely neglected to consider the multi-tiered administrative process that *is* available to aliens detained under § 1226(a). *See* 8 C.F.R. § 236.1(d); 8 C.F.R. § 1003.19(e); *see also Flores*, 507 U.S. at 308–09 (describing the procedural system governing detention of juveniles as part of analysis whether the system violates due process). Likewise, the Court also arguably erred by giving no weight to Congress's mandate, as manifested in 8 C.F.R. § 236.1(c)(8), of "increased detention to ensure removal." 62 Fed. Reg. at 10, 323. Indeed, in

both *Demore* and *Zadvydas*, the Supreme Court's due-process analysis was informed by whether detention under the statute in question served its purported immigration purpose. *See Demore*, 538 U.S. at 528 (noting as part of its due process analysis that "Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully"). Accordingly, the Court should grant summary judgment in favor of Defendants.

## V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE COURT CANNOT GRANT CLASSWIDE DECLARATORY RELIEF THAT IS FUNCTIONALLY EQUIVALENT TO THE CLASSWIDE INJUNCTIVE RELIEF PRECLUDED BY 8 U.S.C. § 1252(F)(1).

The Court cannot grant Plaintiffs the relief they seek because doing so would serve to enjoin the normal operation of 8 U.S.C. § 1226(c), an action that 8 U.S.C. § 1252(f)(1) explicitly prohibits this Court from taking.[15] Thus, the only response to Plaintiffs' common question is no.

In denying Defendants' motion to decertify the class, the Court found that, even if classwide injunctive relief is precluded, Plaintiffs may still pursue classwide declaratory relief without running afoul of § 1252(f)(1). *Reid*, 2018 WL 5269992 at *6. In order to reach this conclusion — and satisfy Fed. R. Civ. P. 23(b)(2) — the Court found that Plaintiffs' requests for injunctive and declaratory relief were essentially the same. *Id.* (citing 1966 Advisory Committee Note to Rule 23(b)(2)) (finding that "the available declaratory judgment in this case corresponds to final injunctive relief as required by Rule 23(b)(2)," which meant that "'as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief.'").

---

[15] Defendants incorporate by reference the arguments regarding 8 U.S.C. § 1252(f)(1) that they raised in opposition to Plaintiffs' Motion to Modify the Class, *see* ECF No. 400 at 2.

But Fed. R. Civ. P. 23(b)(2) cannot certify a class that, in all reality, would afford the very same relief that § 1252(f)(1) precludes, regardless of whether it is cloaked as injunctive relief or corresponding declaratory relief. Indeed, in considering *Jennings* on remand from the Supreme Court, the Ninth Circuit raised this very concern, directing that "[t]he district court must also consider whether a declaration that the detention statutes are unconstitutional because they contain *no* process for seeking bail is an injunction or restraint on the operation of the detention statutes. 8 U.S.C. § 1252(f)(1)." *Rodriguez*, 909 F.3d at 256 n.1.

The Supreme Court adopted this rationale in *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982), where it held that the Tax Injunction Act barred *both* declaratory and injunctive relief "because there is little practical difference between injunctive and declaratory relief"; thus, the court would be "hard pressed to conclude that Congress intended to prohibit taxpayers from seeking one form of anticipatory relief … while permitting them to seek another, thereby defeating the principle purpose of the [Act.]." *See also Samuels v. Mackell*, 401 U.S. 66, 72 (1971) (declaratory as well as injunctive relief was barred where "the declaratory relief alone has virtually the same practical impact as a formal injunction would"). The Sixth Circuit recently echoed this sentiment, stating it was "skeptical" that "Petitioners would prevail" on whether § 1252(f)(1) bars declaratory relief. *Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018). It stated that, while "[i]t is true that 'declaratory relief will not always be the functional equivalent of injunctive relief,' … in this case, it is the functional equivalent." *Id.* (citing *Alli v. Decker*, 650 F.3d 1007, 1014 (3d Cir. 2011)). "The practical effect of a grant of declaratory relief as to Petitioners' detention would be a class-wide injunction against the detention provisions, which is

barred by § 1252(f)(1)." *Id.* This is precisely Plaintiffs' argument here.[16] Classwide relief is therefore unavailable, and Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant Defendants' motion for summary judgment.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

ELIANIS PÉREZ
Assistant Director, District Court Section

LAUREN E. FASCETT
Trial Attorney

Dated: April 15, 2019

*/s/ Catherine M. Reno*
CATHERINE M. RENO
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation —
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC  20044
Tel: (202) 353-8557
Fax: (202) 305-7000
Email: catherine.m.reno@usdoj.gov

*Attorneys for Defendants*

---

[16] Moreover, any suggestion that Rule 23(b)(2) certification should *only* be denied in cases primarily seeking money damages lacks support. The 1966 Advisory Committee Note to Rule 23(b)(2) states that the Rule "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." That, of course, does not mean Rule 23(b)(2) certification should be granted in all other cases.

**CERTIFICATE OF SERVICE**
Case No.: No. 3:13-cv-30125-PBS

I hereby certify on April 15, 2019, I filed the foregoing on the CM/ECF for the District of

Massachusetts. All parties are registered CM/ECF users and were served electronically.

*/s/ Catherine M. Reno*
CATHERINE M. RENO
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation —
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC  20044
Tel: (202) 353-8557
Fax: (202) 305-7000
Email: catherine.m.reno@usdoj.gov